*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

MIQUEENISE CHANTAL WEED,

      Defendant-Appellant.

UNPUBLISHED
January 16, 2026
1:18 PM

No. 372136
Kent Circuit Court
LC No. 19-002781-FC

Before: RICK, P.J., and MALDONADO and KOROBKIN, JJ.

RICK, P.J. (*concurring*).

I concur in the majority's opinion. I write separately to emphasize that, although the trial court lawfully imposed court fees and costs in this matter,[1] the assessment of such financial obligations upon low-income criminal litigants can have life-altering consequences long after any sentence has been fully served. These consequences frequently extend beyond the individual litigant, adversely affecting families, dependents, and, ultimately, the community at large. In my view, even when legislatively authorized, the imposition of monetary obligations on the poor, particularly those burdened with criminal records, is unjust.

At the outset, assessing financial obligations against indigent individuals is akin to expecting water to flow from the squeezing of a stone. The outcome is neither reasonable nor rational. To suggest that such assessments are justified because a litigant may someday receive a windfall, perhaps through a lottery win or an inheritance from a wealthy relative, is fanciful to the

---

[1] Our Supreme Court is currently considering a challenge to court-ordered financial assessments, which could potentially alter this legal landscape, at least with respect to ordering repayment of attorney fees by indigent and partially indigent defendants who are afforded legal counsel by the Michigan Indigent Defense Commission. See *People v Ivey*, unpublished per curiam opinion of the Court of Appeals (Docket No. 366838).

point of absurdity.[2]  For most impoverished defendants, the debt is not merely difficult to pay; it is impossible.

These concerns are not abstract.  In 2019, the American Bar Association issued a report entitled *Fees and Fines: the Criminalization of Poverty*,[3] which chronicles the experiences of offenders across the country whose indigency has been effectively cemented by the imposition of court costs and fees that they have no realistic ability to repay.  While several years old, the article opines that the imposition of fees on the already marginalized poor lessens confidence in the justice system.  It offers some bleak statistics, worth repeating in detail:

> A recent study was conducted by Cornell University and FWD.us which found that in America, approximately one in two adults has had an immediate family member incarcerated (for at least one night).  This is approximately 113 million people.  Admissions to local jails have exceeded 10 million each year for at least the past 20 years.  People earning less than $25,000 per year are 61 percent more likely than people earning more than $100,000 to have had a family member incarcerated, and three times more likely to have had a family member incarcerated for one year or longer.  One in seven adults has had an immediate family member spend at least one year in prison, and one in 34 adults has had an immediate family member spend 10 years or longer in prison. Today, an estimated 6.5 million people have an immediate family member currently incarcerated in jail or prison (1 in 38). There are currently more than 1.5 million people incarcerated in America.

> The United States has only 5 percent of the world's population but houses 25 percent of the world's prisoners.  As the incarcerated population grows, so do the associated costs: the need for more courtrooms, judges, prosecutors, public defenders and probation officers.  Increases in criminal justice spending have strained budgets and led to an amplified reliance on fines and fees in order to defray costs.  This places a disproportionate burden on poor offenders, typically racial minorities, resulting in incarceration for minor offenses.

> According to recent numbers, approximately two-thirds of people in prison have been assessed court fines and fees.  Almost 65 percent of prisoners do not have a high school diploma, "15 to 27 percent of people leaving prison or jail expect to go to a homeless shelter upon release[,] and as many as 60 percent remain unemployed a year after release."

> Lisa Foster, who served on the ABA Task Force on Building Public Trust in the American Justice System, offered her opinion on why this issue has come to

---

[2] My learned and capable colleagues, whom I hold in the highest regard, have not posited this. Suffice it to say, however, that this flawed sentiment exists.

[3] American Bar Association, *Fees and Fines: the Criminalization of Poverty* <https://www.americanbar.org/groups/government_public/resources/public-lawyer/archive/fees-fines-criminalization-poverty> (accessed January 15, 2026).

the forefront: "As we start incarcerating people for longer, state legislators look for ways to fund the justice system. At the same time, there are no new taxes. So, this is quintessentially a state and local issue and takes on different shapes in different jurisdictions." Foster noted that in 43 states, an individual's driver's license can be suspended for failure to pay fees and fines and that people will often drive anyway when they need to get to work, take kids to school, or go to doctor. "If you are caught, you are charged with driving on a suspended license, which is a misdemeanor in most jurisdictions. Now you have a criminal conviction, more fines and fees imposed—and all because the underlying problem is you're poor."[4]

The financial burden imposed on impoverished individuals ensnared in the criminal justice system is not merely a Michigan problem; it is a national one. In October 2025, the Urban Institute and the Brookings Institution Tax Policy Center issued a report entitled *Fines, Fees, and Financial Strains: Challenges for State and Local Governments in a Time of Fiscal Uncertainty*.[5] The report details not only the prevalence of these practices nationwide, but their far-reaching effects on litigants, their families, and their communities. Notably, the authors conclude that such practices may ultimately make communities less safe.[6]

The practice of imposing financial obligations upon the poor who are caught up in the criminal justice system is neither sustainable nor conscionable. While lawful, it perpetuates cycles of poverty and punishment that do little to advance justice. It is my hope that those vested with the authority to address this issue (our Legislature and our Supreme Court) will act to end what is, in my view, a legal but profoundly unjust practice. For these reasons, I respectfully concur.

/s/ Michelle M. Rick

---

[4] *Id.*

[5] Urban Institute & Brookings Institution Tax Policy Institute, *Fines, Fees, and Financial Strains: Challenges for State and Local Governments in a Time of Fiscal Uncertainty* (October 22, 2025), available at <https://taxpolicycenter.org/sites/default/files/2025-10/FINES-FEES-AND-FINANCIAL-STRAIN.pdf> (accessed January 15, 2026).

[6] *Id.* at 14.